IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| STEVEN L. HAYES, individually and on behalf of all others similarly situated, | ) ) ) |
| Plaintiff, | ) ) **JURY TRIAL DEMANDED** |
| v. | ) ) |
| ANTHEM, INC. and ANTHEM COMPANIES, INC., | ) ) ) |
| Defendants. | ) |

## CLASS ACTION COMPLAINT

Plaintiff Steven L. Hayes ("Plaintiff"), by and through his attorneys, upon personal knowledge as to himself and his own acts and experiences, and upon information and belief as to all other matters, alleges as follows:

## NATURE OF THE ACTION

1.       Plaintiff brings this Class Action Complaint ("Complaint") against Defendant Anthem, Inc., formerly known as Wellpoint, Inc., an Indiana corporation, and Defendant The Anthem Companies, Inc. (collectively "Defendants" or "Anthem"), individually and on behalf of all others similarly situated based on Defendants' failure to properly safeguard its customers' personally identifiable information ("PII"), including current and former members' names, dates of birth, medical IDs, Social Security numbers, email addresses, street addresses and employment information including income data, and its customers' personal health information ("PHI").

2.      As a result of a massive data breach suffered by as many as 80 million current and former Anthem health plan members (the "Anthem Security Breach"), Plaintiff and the proposed class have suffered material injuries including, but not limited to, the reasonable value of the PII and PHI, a diminution in the value of their protected personal information, costs and time associated with monitoring and maintaining protection over their identity, heightened risk of identity theft, and other cognizable harms.

3.      In addition, based on Defendants' actions, Plaintiff and the proposed class have received services that were and are inferior to those for which they have contracted, and have not been provided the protection and security Defendants promised when Plaintiff and the proposed class entrusted Defendants with their PII and PHI.

4.      During the week of January 26, 2015, Anthem discovered its IT system had been compromised, and likely "tens of millions" of records were stolen, affecting an estimated 80 million customers.  The intrusion is likely to be the largest security breach ever disclosed by a health care company.  According to Anthem's Chief Information Officer, it is not yet clear how the hackers were able to obtain access identification information and gain access to the company's database.[1]

5.      On February 4, 2015, Anthem, the second largest health insurer in the United States, announced that hackers had breached and stolen personal and financial information of up to 80 million Anthem health insurance plan customers, former customers and employees.  The personal and financial information stolen by the hackers

---

[1] http://www.wsj.com/articles/health-insurer-anthem-hit-by-hackers-1423103720?mod=WSJ_hp_LEFTTopStories (last visited Mar. 18, 2015).

includes customers' names, birthdates, Social Security numbers, street and email

addresses, member identification numbers and employment information, including

income data (collectively "personal data" or "personal information"). The data

compromised and stolen in the Anthem Security Breach also includes personal

information concerning health insurance plan members' children.

6.     According to at least one expert, it is possible that Anthem's security

systems were breached as far back as April 2014, with Anthem only detecting the

incursion nine months later.[2]

7.     Anthem's security failures enabled the hackers to steal PII from within

Anthem's databases, putting Class members' personal information at serious and ongoing

risk. For instance, Anthem stored the Social Security numbers of these 80 million

affected customers without encrypting them, which would have made that information

less valuable to hackers and harder to access in bulk.[3] But, by failing to encrypt the data,

Anthem made the data "easily readable by hackers."[4] The hackers can now use the

---

[2] KREBS ON SECURITY, http://krebsonsecurity.com/2015/02/anthem-breach-may-have-started-in-april-2014/ ("Analysis of open source information on the cybercriminal infrastructure likely used to siphon 80 million Social Security numbers and other sensitive data from health insurance giant Anthem suggests the attackers may have first gained a foothold in April 2014, nine months before the company says it discovered the intrusion.") (last visited March 18, 2015)

[3] Danny Yadron & Melinda Beck, Health Insurer Anthem Didn't Encrypt Data in Theft, Wall Street Journal (Feb. 5, 2015, 7:26 PM), http://www.wsj.com/articles/investigators-eye-china-in-anthem-hack-1423167560 (last visited Mar. 18, 2015).

[4] *Id.*

information they obtained as a result of Anthem's inadequate security to exploit and injure Class members across the United States.

8.     The Anthem Security Breach was caused and enabled by Anthem's knowing violation of its obligations to abide by best practices and industry standards in protecting customers' personal information.  Anthem grossly failed to comply with security standards and allowed their customers' personal information to be compromised, all in an effort to save money by cutting corners on security measures that could have prevented or mitigated the Security Breach that occurred.

9.     Anthem failed to disclose the extent of the Security Breach and notify its affected customers of the Breach in a timely manner.  Anthem failed to take other reasonable steps to clearly and conspicuously inform its customers of the nature and extent of the Security Breach.  Furthermore, by failing to provide adequate notice, Anthem prevented Plaintiff and Class members from protecting themselves from the Security Breach.

10.    As a result of the Anthem Security Breach, Plaintiff and Class members have had their personal data stolen, have paid more for health insurance than they would have had they known that Anthem did not have adequate and reasonable systems and data safeguards to protect consumers' personal data, and have been exposed to the imminent, certain impending injury arising from the substantially increased risk of identity theft, fraud, and further misuse resulting from their personal data being placed in the hands of hackers.

11.     Plaintiff and members of the proposed Class have suffered actual and imminent impending injuries as a direct result of the Anthem Security Breach.  The injuries suffered by Plaintiff and the proposed Class as a direct result of the Anthem Security Breach include: (a) theft of their personal data; (b) money paid for health insurance in that Plaintiff and Class members would not have obtained or maintained health insurance from Anthem affiliated entities had Anthem disclosed that it lacked adequate systems and procedures to reasonably safeguard customers' personal data; (c) overpayments paid for health insurance purchased or maintained in that a portion of the purchase price or premiums for insurance paid by Plaintiff and the Class was for the costs of Anthem providing reasonable and adequate safeguards and security measures to protect customers' personal data, which Anthem did not do, and as a result, Plaintiff and members of the Class did not receive what they paid for and were overcharged; (d) costs associated with the detection and prevention of identity theft; (e) costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate and deal with the consequences of the Anthem Security Breach and the stress, nuisance and annoyance of dealing with all issues resulting from the Anthem Security Breach; (f) the imminent impending injury arising from potential fraud and identify theft posed by their personal data being placed in the hands of the hackers; (g) damages to and diminution in value of their personal data entrusted to Anthem for the sole purpose of obtaining health insurance from Anthem and with the mutual understanding that Anthem would safeguard Plaintiff's and Class members' personal data against theft and not allow access and misuse of their personal data by others; (h) the

reasonable value of the PII and PHI entrusted to Anthem; (i) the continued risk to their personal data, which remains in the possession of Anthem and which is subject to further breaches so long as Anthem fails to undertake appropriate and adequate measures to protect Plaintiff's and Class members' personal data in its possession.

12.     Accordingly, Plaintiff, on behalf of himself and other members of the Class, asserts claims for breach of implied contract, negligence, bailment, and unjust enrichment, and he seeks injunctive relief, declaratory relief, monetary damages, statutory damages, and all other relief as authorized in equity or by law.  Plaintiff seeks to remedy these harms, and prevent their future occurrence, on behalf of himself and all similarly situated persons whose personal data was compromised and stolen as a result of the Anthem Security Breach.

## THE PARTIES

13.     Plaintiff Steven L. Hayes is a natural person and resident of the State of Minnesota.  Plaintiff Hayes purchased health insurance provided by Blue Cross and Blue Shield of Minnesota for himself and his family, and as part of this purchase, Plaintiff's personal information, along with that of his family, was delivered to Anthem, with which Blue Cross Blue Shield of Minnesota is affiliated, for safekeeping and for certain uses necessary to effectuate the purpose of the agreement between Plaintiff and Blue Cross Blue Shield of Minnesota.

14.     Plaintiff's personal data was compromised and stolen as a result of the Anthem Security Breach.  Plaintiff was harmed by having his personal data compromised and stolen, by purchasing health insurance from an Anthem affiliate and paying more for

6

health insurance than he would have paid had he known and had Anthem disclosed that Anthem lacked adequate and reasonable systems and data safeguards to protect consumers' personal data, and by suffering imminent, certainly impending additional future harm arising from his personal data being placed in the hands of the hackers, resulting in the substantially increased risk of identity theft, fraud and further misuse of his personal data including its sale on the Internet black market.  Plaintiff would not have purchased health insurance from an Anthem affiliate for himself and his family had Anthem disclosed that it lacks adequate computer systems and data security practices to safeguard his and his family's personal data from theft.

15.    Plaintiff would not have given personal data to Anthem—indeed, he would not have obtained health insurance at all from an Anthem affiliate—had Anthem told him that it lacked adequate computer systems and data security practices to safeguard customers' personal data from theft.

16.    Plaintiff suffered actual injury and damages from having his personal data, including his financial, health, and personal information, compromised and stolen in and as a result of the Anthem Security Breach.

17.    Plaintiff suffered actual injury and damages in paying money to and purchasing insurance from an Anthem affiliate that he would not have paid had Anthem disclosed that it lacked adequate computer systems and data security practices to safeguard customers' personal data.

18.    Plaintiff was overcharged for health insurance in that a portion of the purchase price included the costs of Anthem providing reasonable and adequate

safeguards and data security measures to protect customers' personal data, which Anthem failed to provide and, as a result, Plaintiff did not receive what he paid for and was overcharged.

19. Headquartered in Indianapolis, Indiana, Defendant Anthem, Inc., doing business as Anthem Health, Inc., is an independent licensee of the Blue Cross and Blue Shield Association serving members in California, Colorado, Connecticut, Georgia, Indiana, Kentucky, Maine, Missouri, Nevada, New Hampshire, New York, Ohio, Virginia and Wisconsin; and specialty plan members in other states. Defendant Anthem Inc. was previously known as WellPoint, Inc., and is an Indiana corporation with principal offices at 120 Monument Circle, Indianapolis, Indiana.

20. Defendant The Anthem Companies, Inc. is an Indiana corporation with its corporate headquarters in Indianapolis, Indiana.

21. Anthem, Inc. is the second-largest health insurance company in the nation, serving more than 37.5 million medical members through its affiliated health plans and a total of more than 67.8 million individuals through all subsidiaries. Anthem, Inc. claimed 2014 net income totaling approximately $2.6 billion.

22. Defendant Anthem, Inc. owns, controls and operates, including through its subsidiary, Anthem Insurance Companies, various health plan brands that were affected by the Anthem Security Breach, including Anthem Blue Cross, Anthem Blue Cross and Blue Shield, Blue Cross and Blue Shield of Georgia, Empire Blue Cross and Blue Shield, Amerigroup, Caremore and Unicare as well as members of the Blue Cross and Blue Shield Association's BlueCard program. Anthem, Inc., The Anthem Companies, Inc.,

and their subsidiaries and health care plans are collectively referred to as "Anthem" in this Complaint.

23.     According to Anthem's website, one in nine Americans receives insurance coverage for their medical care through Anthem.  In its Fourth Quarter 2014 results, Anthem reported it had approximately 37.5 million healthcare enrollees.

## JURISDICTION & VENUE

24.     This Court has original jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because this is a class action involving more than 100 putative class members and the amount in controversy exceeds $5,000,000, exclusive of interest and costs.  Plaintiff (and many members of the class) and Defendants are citizens of different states.

25.     This Court has personal jurisdiction over Defendants because a substantial portion of the wrongdoing alleged in this Complaint took place in this District and because Anthem's principal place of business is in the State of Indiana.

26.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1301(a)(2), 1391(b)(2), and 1391(c)(2) as a substantial part of the events giving rise to the claims emanated from activities within this District, and Defendants conduct substantial business in this District.

## CLASS ACTION ALLEGATIONS

27.     Plaintiff brings all claims as class claims under Federal Rule of Civil Procedure 23.  The requirements of Federal Rule of Civil Procedure 23(a), 23(b)(1), 23(b)(2) and 23(b)(3) are met with respect to the Class defined below.

28.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff brings this action as a national class action for himself and all members of the following Class of similarly situated persons:

<u>The Nationwide Class</u>
All persons who reside in the United States whose personal data was compromised as a result of the security breach first disclosed by Anthem on February 4, 2015.

29.     Excluded from the Class are Defendants; officers, directors, and employees of Defendants; any entity in which Defendants have a controlling interest, is a parent or subsidiary, or which is controlled by Defendants; and the affiliates, legal representatives, attorneys, heirs, predecessors, successors, and assigns of Defendants.  Also excluded are the judges and court personnel in this case and any members of their immediate families.

30.     Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of the claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

31.     All members of the proposed Class and subclasses are readily ascertainable in that Anthem has access to addresses and other contact information for all members of the Class, which can be used for providing notice to Class members.

32.     ***Numerosity.***  The Class is so numerous that joinder of all members is impracticable.  The Class includes as many as 80 million individuals whose personal data was compromised by the Anthem Security Breach.  While the exact number of class members is unknown to Plaintiff at this time, it includes, as Anthem has admitted, as

many as 80 million individuals whose personal data was compromised, breached and stolen in the Anthem Security Breach.  Anthem has over 37 million current health insurance customers.

33.     ***Commonality***.   There are numerous questions of law and fact common to Plaintiff and the Class, including the following:

- whether Anthem engaged in the wrongful conduct alleged in this Complaint;

- whether Anthem's conduct was unlawful;

- whether Anthem failed to implement and maintain reasonable systems and security procedures and practices to protect customers' personal data;

- whether Anthem unlawfully used, maintained, lost or disclosed Class members' PII and PHI;

- whether Anthem unreasonably delayed in notifying affected customers of the Security Breach;

- whether Anthem owed a duty to Plaintiff and members of the Class to adequately protect their personal data and to provide timely and accurate notice of the Anthem Security Breach to Plaintiff and members of the Class;

- whether Anthem breached its duties to protect the personal data of Plaintiff and members of the Class by failing to provide adequate data security and failing to provide timely and adequate notice of the Anthem Security Breach to Plaintiff and the Class;

- whether Anthem's conduct was negligent;

- whether Anthem knew or should have known that its computer systems were vulnerable to attack;

- whether Anthem's conduct, including its failure to act, resulted in or was the proximate cause of the breach of its systems, resulting in the loss of millions of consumers' personal data;

- whether Anthem unlawfully failed to inform Plaintiff and members of the Class that it did not maintain computers and security practices adequate to reasonably safeguard customers' financial and personal data;

- whether Anthem should have notified the public, Plaintiff and Class members immediately after it learned of the Security Breach;

- whether Plaintiff and members of the Class suffered injury, including ascertainable losses, as a result of Anthem's conduct (or failure to act);

- whether Anthem's breached its duties to Plaintiff and the Class as a bailee of PII and PHI entrusted to it and for which it Anthem owed a duty to safeguard and of safekeeping;

- whether Plaintiff and members of the Class are entitled to recover damages;

- whether Plaintiff and Class members are entitled to equitable relief, including injunctive relief, restitution, disgorgement, and/or other equitable relief.

33.    *Typicality*.  Plaintiff's claims are typical of the claims of the Class in that the representative Plaintiff, like all Class members, had his personal data compromised, breached and stolen in the Anthem Security Breach.  Plaintiff and all Class members were injured through the uniform misconduct of Anthem described in this Complaint and assert the same claims for relief.

34.    Plaintiff and his counsel will fairly and adequately protect the interests of the Class.  Plaintiff has retained counsel who are experienced in class action and complex litigation, including in security breach litigation.  Plaintiff has no interests that are antagonistic to, or in conflict with, the interests of other members of the Class.

35.    The questions of law and fact common to Class members predominate over any questions which may affect only individual members.

12

36.    *Superiority*.  A class action is superior to other available methods for the fair and efficient adjudication of the controversy.  Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Moreover, absent a class action, most Class members would find the cost of litigating their claims prohibitively high and would therefore have no effective remedy, so that in the absence of class treatment, Defendants' violations of law inflicting substantial damages in the aggregate would go unremedied without certification of the Class. Plaintiff and Class members have been harmed by Anthem's wrongful conduct and/or action.  Litigating this action as a class action will reduce the possibility of repetitious litigation relating to Anthem's conduct and/or inaction.  Plaintiff knows of no difficulties that would be encountered in this litigation that would preclude its maintenance as a class action.

37.    Class certification, therefore, is appropriate under Fed. R. Civ. P. 23(b)(3), because the above common questions of law or fact predominate over any questions affecting individual members of the Class, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

38.    Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A), in that the prosecution of separate actions by the individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members, which would establish incompatible standards of conduct for Anthem.  In contrast, the conduct of this action as a class action conserves judicial resources and the parties' resources, and protects the rights of each Class member.

## **FACTUAL ALLEGATIONS**

39.     Anthem is licensed to conduct insurance operations in all 50 states through

its subsidiaries.  Like many other insurance companies, Anthem collects, processes, and

retains sensitive and confidential member information.[5]

40.     Plaintiff has health insurance issued by Blue Cross Blue Shield of

Minnesota, which is affiliated with Anthem and, as a result, he was required to provide

his PII and PHI to Anthem.

41.     Anthem admits that on or about January 29, 2015, it detected a massive

Security Breach that compromised the PII and PHI of approximately 80 million insureds.

42.     The impacted plans/brands include: Anthem Blue Cross, Anthem Blue

Cross and Blue Shield, Blue Cross and Blue Shield of Georgia, Empire Blue Cross and

Blue Shield, Amerigroup, Caremore, and Unicare.

43.     Moreover, even Blue Cross and Blue Shield plans not owned by Anthem

are affected, as the national Blue Cross and Blue Shield Association's BlueCard uses a

single electronic network for claims processing and reimbursement.[6]

44.     On or about February 4, 2015, Anthem set up a website where the Security

Breach was disclosed to Anthem customers by way of a letter from Joseph R. Swedish,

President and CEO of Anthem.

45.     The letter stated that

_____

[5]  Wellpoint, Inc., Annual Report (Form 10-K), 35 (Dec. 31, 2013).

[6]  Frequently Asked Questions, Anthem, http://www.anthemfacts.com/faq (last
visited Mar. 18, 2015).

14

Anthem was the target of a very sophisticated external cyber attack. These attackers gained unauthorized access to Anthem's IT system and have obtained personal information from our current and former members such as their names, birthdays, medical IDs/social security numbers, street addresses, email addresses and employment information, including income data. . . .

Anthem's own associates' personal information — including my own — was accessed during this security breach.  We join you in your concern and frustration, and I assure you that we are working around the clock to do everything we can to further secure your data. Anthem will individually notify current and former members whose information has been accessed. . . .

I want to personally apologize to each of you for what has happened, as I know you expect us to protect your information. We will continue to do everything in our power to make our systems and security processes better and more secure, and hope that we can earn back your trust and confidence in Anthem.

Sincerely,
Joseph R. Swedish
President and CEO
Anthem, Inc.

46.    Anthem did not provide any information as to when its systems were compromised, how long third parties had access to its systems or what measures have been taken to prevent further breaches, but it is believed that hackers have had access for months before Anthem discovered the breach.

**Anthem Owed a Duty to Customers to Adequately Safeguard their Personal Data and to Provide Timely Notice of a Breach of Its Systems.**

47.    Health care companies, including Anthem, have an obligation to maintain the security of their health plan customers' and former customers' personal, health, and financial information.

48.     Anthem owes a duty to its customers and former health plan customers to protect the safety, security, and confidentiality of their personal data.

49.     Anthem owes a further duty to its current and former health plan customers to immediately and accurately notify them of a breach of its systems to protect them from identify theft and other misuse of their personal data.

50.     As Anthem admits and accepts the existence of the duties to safeguard PII and PHI, and expressly represents that it will exercise care with respect to the personal and private information provided to it.

51.     For example, in its HIPAA Notice of Privacy Practices handbook, which is part of the agreement between Anthem and its health insurance customers, Anthem discusses the safeguards it represents it provides to customers' PHI:

> We keep the health and financial information of our current and former members private, as required by law, accreditation standards and our rules.

> We are dedicated to protecting your PHI, and have set up a number of policies and practices to help make sure your PHI is kept secure.  We keep your oral, written and electronic PHI safe using physical, electronic, and procedural means.  These safeguards follow federal and state laws.  Some of the ways we keep your PHI safe include securing offices that hold PHI, password Protecting computers, and locking storage areas and filing cabinets. . . .

52.     Moreover, Anthem, in its privacy policy, posted on its website at https://www.anthem.com, states that:

> Your privacy is very important to us and we will make every reasonable effort to safeguard any information we collect.

> **Personal Information (including Social Security Number) Privacy Protection Policy**

Anthem Blue Cross and Blue Shield maintains policies that protect the confidentiality of personal information, including Social Security numbers, obtained from its members and associates in the course of its regular business functions.  Anthem Blue Cross and Blue Shield is committed to protecting information about its customers and associates, especially the confidential nature of their personal information (PI).

Personal information is information that is capable of being associated with an individual through one or more identifiers including but not limited to, a Social Security number, a driver's license number, a state identification card number, an account number, a credit or debit card number,...or a health insurance identification number....

- Anthem Blue Cross and Blue Shield is committed to protecting the confidentiality of Social Security numbers and other Personal Information.

- Anthem Blue Cross and Blue Shield's Privacy Policy imposes a number of standards to:

  - guard the confidentiality of Social Security numbers and other personal information,

  - prohibit the unlawful disclosure of Social Security numbers, and

  - limit access to Social Security numbers.

Anthem Blue Cross and Blue Shield will not use or share Social Security numbers or personal information with anyone outside the company....

Anthem Blue Cross and Blue Shield safeguards Social Security numbers and other personal information by having physical, technical, and administrative safeguards in place.

(Emphasis in the original).

53.    Anthem's duties to safeguard data and provide notice of a breach also arise

from the Health Insurance and Portability and Accountability Act (HIPAA).  HIPAA and

implementing regulations require Anthem to establish procedures to keep confidential

and private personally identifiable information it maintains on enrollees and members,

including without limitation, names and Social Security numbers.  Federal law requires

healthcare providers, including Anthem, to implement reasonable safeguards for such information, which Anthem failed to do.  45 C.F.R. § 164.530(c)(1).  It also requires that companies provide notice of the breach of unsecured protected health information, 45 C.F.R. § 164.404, which includes protected health information that is not rendered unusable, unreadable, or indecipherable to unauthorized persons — i.e., non-encrypted data.  *See* C.F.R. § 164.402.  Anthem failed to provide such notice.

54.    By HIPAA regulation, Anthem has the responsibility to:

(1) Ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives, maintains, or transmits.

(2) Protect against any reasonably anticipated threats or hazards to the security or integrity of such information.

(3) Protect against any reasonably anticipated uses or disclosures of such information that are not permitted or required under subpart E of this part.

(4) Ensure compliance with this subpart by its workforce.

45 C.F.R. § 164.306.

55.    While Anthem expresses understanding of the need for, and concern for, the security of Plaintiff's personal information, PII and PHI, it has a history of not protecting personal information, and has not lived up to the standards it has espoused.

18

56.     Anthem admitted that the information involved was not encrypted in its database, which "drew immediate fire from some security experts" because "it is irresponsible for businesses not to encrypt the data."[7]

57.     This is not the first time Anthem failed to protect personal and private information.  The U.S. Department of Health and Human Services found that for 2009 and 2010, WellPoint (the predecessor entity of Anthem) did not adequately implement policies and procedures to protect unsecured electronic protected health information, leading to a breach of data security.[8]

58.     This failure to protect customers' data resulted, beginning on October 23, 2009 and continuing until March 7, 2010, in WellPoint unlawfully disclosing the PHI of 612,402 individuals by allowing access to the individuals' data, included names, dates of birth, addresses, Social Security numbers, telephone numbers, and health information.

59.     In the prior breach, an investigation by the HHS Office for Civil Rights (OCR) revealed security weaknesses in WellPoint's online application database that left data accessible to unauthorized access by individuals over the Internet.  The OCR's investigation revealed that WellPoint failed to implement appropriate administrative and technical safeguards.  The investigation found that WellPoint did not adequately

---

[7] Chad Terhune, *Anthem hack exposes data on 80 million; experts warn of identity theft*, LA Times (Feb. 5, 2015, 10:56 AM), http://www.latimes.com/business/la-fi-anthem-hacked-20150204-story.html#page=1 (last visited Mar. 18, 2015).

[8] Elizabeth Weise, *Anthem fined $1.7 million in 2010 breach*, USA Today (Feb. 5, 2015, 6:13 PM), http://www.usatoday.com/story/tech/2015/02/05/anthem-health-care-computer-security-breach-fine-17-million/22931345/  (last visited Mar. 18, 2015).

implement policies and procedures for authorizing access to its online application

database, failed to perform appropriate evaluation in response to a software upgrade to its

information systems, and failed to have necessary safeguards in place to verify the person

or entity seeking access to electronic protected health information maintained in its

application database.

60.    In 2012, Anthem Blue Cross settled a lawsuit brought by the California

Attorney General over a security breach of approximately 30,000 customers when

Anthem Blue Cross sent letters to them with their Social Security numbers clearly visible

through the transparent window on the envelopes.

61.    Additionally, in 2013, Anthem posted the Social Security or tax

identification numbers for over 24,000 California doctors in its online provider directory.

62.    As noted by Paul Stephens, director of policy and advocacy at the Privacy

Rights Clearinghouse, "Anthem does not have a very good track record of protecting the

information entrusted to them."[9]

63.    Anthem was not only cognizant of the need to safeguard personal

information, based on the regulatory requirements, but it was also well known to Anthem

that health care providers are frequently the target of cyber attacks because their networks

store large amounts of sensitive personal information.  Health care data is far more

valuable on the black market than credit card or other personal information, as it has a

---

[9] Chad Terhune, *Anthem hack raises fears about medical data*, L.A. TIMES, Feb.
5, 2015, http://www.latimes.com/business/la-fi-anthem-hack-fallout-20150206-
story.htmll#page=1 (last visited Mar. 18, 2015).

high degree of reliability and represents a more complete picture than other forms of personal information.

64.     Businesses that store such information are therefore likely to be targeted by cyber criminals.  Unlike credit card and bank account numbers, information maintained by health care companies — such as date of birth and Social Security number — are not easily destroyed and can be easily used to perpetrate identify theft and other types of frauds.  Medical information is highly valuable and is reportedly "worth 10 times more than [a person's] credit card number on the black market."[10] According to a security expert, at a black market auction credit card records were selling for $0.33 while one patient's medical records sold for $251.[11]

65.     The unauthorized disclosure of Social Security numbers can be particularly damaging, because Social Security numbers cannot easily be replaced.  In order to obtain a new number a person must prove, among other things, that he or she continues to be disadvantaged by the misuse.  Thus, no new number can be obtained until the damage has been done.

---

[10] Caroline Humer & Jim Finkle, *Your medical record is worth more to hackers than your credit card*, Reuters, http://www.reuters.com/article/2014/09/24/us-cybersecurity-hospitals-idUSKCN0HJ21I20140924 (last visited Mar. 18, 2015).

[11]  Reed Abelson & Julie Creswell, *Data Breach at Anthem May Forecast a Trend*, N.Y. Times, http://www.nytimes.com/2015/02/07/business/data-breach-at-anthem-may-lead-to-others.html (last visited Mar. 18, 2015).

66.    According to a study produced by Javelin Strategy & Research, "consumers who had their Social Security number compromised in a data breach were 5 times more likely to be a fraud victim than an average consumer."[12]

67.    Furthermore, as the Social Security Administration ("SSA") warns:

> Keep in mind that a new number probably will not solve all your problems.  This is because other governmental agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) likely will have records under your old number.  Along with other personal information, credit reporting companies use the number to identify your credit record.  So using a new number will not guarantee you a fresh start.  This is especially true if your other personal information, such as your name and address, remains the same.

> If you receive a new Social Security Number, you should not be able to use the old number anymore.

> For some victims of identity theft, a new number actually creates new problems.  If the old credit information is not associated with your new number, the absence of any credit history under the new number may make more difficult for you to get credit. [13]

68.    The personal data of Plaintiff and Class members stolen in the Anthem Security Breach constitutes a dream for hackers and a nightmare for Plaintiff and the Class.  Plaintiff's and Class members' personal data stolen in the Anthem Security Breach represents essentially one-stop shopping for identity thieves.

_____

[12] JAVELIN STRATEGY & RESEARCH, https://www.javelinstrategy.com/news/1387/92/More-Than-12-Million-Identity-Fraud-Victims-in-2012-According-to-Latest-Javelin-Strategy-Research-Report/d,pressRoomDetail (last visited Mar. 18, 2015).

[13] SSA, Identity Theft and Your Social Security Number, SSA Publication No. 05-10064 (Dec. 2013), *available at* http://www.ssa.gov/pubs/EN-05-10064.pdf (last visited Mar. 18, 2015).

69.     The United States Government Accountability Office noted in a June 2007 report on Data Breaches ("GAO Report") that identity thieves use personal identifying data to open financial accounts, receive government benefits, and incur charges and credit in a person's name.[14]  As the GAO Report stated, this type of identity theft is the most harmful because it may take some time for the victim to become aware of the theft and can adversely impact the victim's credit rating.  In addition, the GAO Report states that victims of identity theft will face "substantial costs and inconveniences repairing damage to their credit records . . . [and their] good name."

70.     According to the Federal Trade Commission ("FTC"), identity theft wreaks havoc on consumer's finances, credit history, and reputation and can take time, money, and patience to resolve.[15]  Identity thieves use stolen personal information for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.[16]

71.     A person whose personal information has been compromised may not see any signs of identity theft for *years*.  According to the GAO Report:

---

[14]  *See* http://www.gao.gov/new.items/d07737.pdf  (last visited Mar. 18, 2015).

[15]  *See Taking Charge, What to Do If Your Identity is Stolen*, FTC, 3 (2012), http://www.consumer.ftc.gov/articles/pdf-0009-taking-charge.pdf (last visited Mar. 18, 2015).

[16]  *Id.* The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 16 CFR § 603.2. The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." *Id.*

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft.  Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years.  As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[17]

***The personal information left exposed by Anthem was of substantial value to Plaintiff.***

72.     Companies recognize that Personal Information is a valuable asset.  Indeed, Symantec Corporation has even created a software application that values a person's identity on the black market.[18]

73.     Personal Information is a valuable commodity.  A "cyber black-market" exists in which criminals openly post stolen credit card numbers, Social Security numbers, and other personally identifiable information on a number of Internet websites.  Plaintiff's and Class members' personal data stolen in the Anthem Security Breach has a high value on both legitimate and black markets.

74.     At an FTC public workshop in 2001, then-Commissioner Orson Swindle described the value of a consumer's personal information as follows:

> The use of third party information from public records, information aggregators and even competitors for marketing has become a major facilitator of our retail economy.  Even [Federal Reserve] Chairman [Alan] Greenspan suggested

---

[17]   GAO, *supra* note 14 at 29.

[18]   *See* Risk Assessment Tool, Norton 2010, http://www.everyclickmatters. com/ victim/ assessment-tool.html; *see also* T. Soma, *et al., Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets,* 15 R. J.L. & T. 11, at *3-4 (2009).

here some time ago that it's something on the order of the life blood, the free flow of information.[19]

75.     Today, consumers' personal data functions as a "new form of currency" that supports a $26 billion per year online advertising industry in the United States.[20]

76.     Consumers place a high value not only on their PII, but also on the privacy of that data.  Researchers have already begun to shed light on how much consumers value their data privacy – and the amount is considerable.  Indeed, studies confirm that "once people were provided with salient privacy information, they chose sites they considered privacy protective."[21]

77.     Notably, one study on website privacy determined that U.S. consumers valued the restriction of improper access to their personal information – the very injury at issue here – between $11.33 and $16.58 per website.[22]  Furthermore, the study

---

[19] FEDERAL TRADE COMMISSION, *The Information Marketplace: Merging and Exchanging Consumer Data*, *transcript available* at http://www.ftc.gov/news-events/events-calendar/2001/03/information-marketplace-merging-exchanging-consumer-data (last visited Mar. 18, 2015).

[20] *See* Julia Angwin and Emily Steel, *Web's Hot New Commodity: Privacy*, http://online.wsj.com/article/SB10001424052748703529004576160764037920274.html (last visited Mar. 18, 2015).

[21] Tsai, Cranor, Acquisti, and Egelman, *The Effect of Online Privacy Information on Purchasing Behavior*, 31 Information Systems Research 254, 254 (June 2011).

[22] Hann, Hui, *et al*, The Value of Online Information Privacy: Evidence from the USA and Singapore, at 17. Oct. 2002, *available at* http://citeseerx.ist.psu.edu/viewdoc/summary?doi=10.1.1.58.4530 (last visited Mar. 18, 2015).

determined that "[a]mong U.S. subjects, protection against errors, improper access, and secondary use of personal information is worth US$30.49 – 44.62."[23]

78.     Given these facts, any company that transacts business with a consumer and then compromises the privacy of consumers' PII has thus deprived that consumer of the full monetary value of the consumer's transaction with the company.

79.     Former and current Anthem plan members and those whose data was compromised will have to spend time and money securing their personal information and protecting their identities.  They will need to monitor their accounts and credit, and will also have to pay for credit monitoring or credit reports in the wake of the Security Breach to make sure that their credit and identity is not harmed by anyone who has stolen their information.  Individuals whose bank accounts are compromised may have to pay fees to their banks for new debit and credit cards, or have to pay fees to have the cards shipped faster so that they do not have to wait weeks to make purchases on their accounts.

***Beyond financial damages, loss of PHI poses additional risks and harms to the Class.***

80.     While security breaches related to financial information pose threats to the financial stability of those affected, the Anthem Security Breach has even more risks attached.  "In addition to the financial harm associated with other types of identity theft, victims of medical identity theft may have their health endangered by inaccurate entries in their medical records.  This inaccurate information can potentially cause victims to receive improper medical care, have their insurance depleted, become ineligible for

---

[23] *Id.*

health or life insurance, or become disqualified from some jobs.  Victims may not even

be aware that a theft has occurred because medical identity theft can be difficult to

discover, as few consumers regularly review their medical records, and victims may not

realize that they have been victimized until they receive collection notices, or they

attempt to seek medical care himself, only to discover that they have reached their

coverage limits."[24]

81.     Privacy expert Rick Kam, president and co-founder of the Portland, Oregon-

based company ID Experts, says: "Such information can be sold on the black market to

open the door to a range of identity theft schemes.  For instance, criminals have all the

information they need to submit fraudulent tax returns[.]"  Victims might not realize they

have been affected until they try to process their returns.[25]

82.     The State of Kentucky delayed the issuance of tax refunds in response to

concerns over fraudulent claims.[26]  On February 5, 2015, Intuit, which operates TurboTax,

temporarily stopped processing tax returns for 24 hours because of a rise in fraudulent state

---

[24] The President's Identity Theft Task Force, Combating Identity Theft: A Strategic Plan, at 20.

[25] Shari Rudavsky, *Anthem Data Breach Could be 'Lifelong Battle' for Customers*, Indy Star, Feb. 7, 2015, *available at* http://www.indystar.com/story/news/2015/02/05/anthem-data-breach-lifelong-battlecustomers/22953623/ (last visited Mar. 18, 2015).

[26] Michaela MacDonald, *Kentucky temporarily delays electronic tax returns,* WHAS 11 ABC, http://www.whas11.com/story/news/2015/02/06/kentucky-temporarily-delays-electronic-tax-returns/23019767/ (last visited Mar. 18, 2015).

tax filings.[27]   The state of Connecticut delayed the payment of tax refunds in the wake of the Anthem Security Breach.[28]

83.     "With the advent of the prescription drug benefit of Medicare Part D, the Department of Health and Human Services' Office of the Inspector General (HHS OIG) has noted a growing incidence of health care frauds involving identity theft."[29] Identity thieves can use such information "fraudulently to enroll unwilling beneficiaries in alternate Part D plans in order to increase . . . sales commissions" or commit other types of fraud: "The types of fraud that can be perpetrated by an identity thief are limited only by the ingenuity and resources of the criminal."[30]

84.     Identity thieves may commit various types of crimes such as immigration fraud, obtaining a driver's license or identification card in the victim's name but with another's picture, using the victim's information to obtain a fraudulent refund.  The United States government and privacy experts acknowledge that it may take years for identity theft to come to light and be detected.

---

[27]  Intuit, Inc., *Intuit Working With State Governments to Solve Emerging Tax Fraud Problem*, http://investors.intuit.com/press-releases/press-release-details/2015/Intuit-Working-With-State-Governments-to-Solve-Emerging-Tax-Fraud-Problem/default.aspx (last visited Mar. 18, 2015).

[28] *ID Concerns Prompt DRS To Delay Mailing Refunds, Suggest Filing Early,* CBS Connecticut, http://connecticut.cbslocal.com/2015/02/06/id-concerns-prompt-drs-to-delay-mailing-refunds-suggest-filing-early/ (last visited Mar. 18, 2015).

[29] *Id.* at 31.

[30] *Id.*

85.     As the FTC recognizes, once identity thieves have personal information, "they can drain your bank account, run up your credit cards, open new utility accounts, or get medical treatment on your health insurance."[31]

86.     As noted above, the disclosure of Social Security numbers in particular poses a significant risk.  Criminals can, for example, use Social Security numbers to create false bank accounts or file fraudulent tax returns.  Former and current Anthem plan members whose Social Security numbers have been compromised will need to spend time contacting various agencies, such as the Internal Revenue Service and the Social Security Administration.  They also now face a real and immediate risk of identity theft and other problems associated with the disclosure of their Social Security number, and will need to monitor their credit and tax filings for an indefinite duration.

87.     Again, because the information Anthem allowed to be compromised and taken is of such a durable and near-permanent quality, the harms to Plaintiff and the Class will continue to grow, and Plaintiff and the Class will continue to be at risk for further harm.

### Anthem's post-breach actions were insufficient

88.     Personal and financial information can be sold on the black-market almost immediately.  As Illinois Attorney General Lisa Madigan aptly put it, "the second somebody gets your credit or debit card information, it can be a matter of hours or days until it's sold on the black market and someone's starting to make unauthorized

---

[31] FTC, *Signs of Identity Theft* (July 2012), http://www.consumer.ftc.gov/articles/0271-signs-identity-theft (last visited Mar. 18, 2015).

transactions."[32]  Thus, despite Anthem's promise to mail letters to impacted consumers in a matter of weeks, the compromised information could be used weeks prior to the receipt of any letter from Anthem.  Anthem's proposed solutions to the potential fraud are, therefore, woefully deficient.

89.     Only after and as a result of the massive Security Breach, Anthem retained Mandiant, one of the world's leading cybersecurity firms, to evaluate Anthem's systems and identify solutions.[33]

90.     Anthem did not immediately notify affected plan members of the Security Breach.  Instead, Anthem said that it would begin mailing letters to individuals whose personal information was compromised "*in the coming weeks*."[34] As a result, many class members will be unaware that their personal information has been compromised and therefore will not timely take the steps necessary to safeguard themselves from the improper use of that information.

91.     Immediate notice of a security breach is essential to protect people such as Plaintiff and Class members.  Anthem failed to provide such immediate notice, thus further exacerbating the damages sustained by Plaintiff and the Class resulting from the breach and from Anthem's delay in providing timely and accurate notice.  Such delays are

---

[32]  Phil Rosenthal, *Just assume your credit and debit card data were hacked*, http://www.chicagotribune.com/business/columnists/ct-data-breach-credit-scam-rosenthal-1001-biz-20140930-column.html#page=1 (last visited Mar. 18, 2015).

[33] http://www.anthemfacts.com/ (last visited Mar. 18, 2015).

[34] Anthem Data Breach FAQ, http://www.anthemfacts.com/faq (last visited Mar. 18, 2015).

unwarranted and increase directly the likelihood that thieves would be able to steal victims' identities and otherwise abuse the personal information stolen in the Anthem Security Breach before victims even know that they are at risk.

92.   The impact of the breach has been immediate.  Internet scammers have already launched phishing attacks via email to Anthem customers, promising free credit monitoring but actually intending to steal customers' information.[35]

93.   Security experts describe the personal data stolen in the Anthem Security Breach as the "keys to the kingdom."[36]

## COUNT I — NEGLIGENCE

94.   Plaintiff incorporates by reference those paragraphs set out above as if fully set forth here.

95.   Anthem owed a duty to Plaintiff and members of the Class to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting and protecting their personal, health, and financial information in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons.  This duty included, among other things, designing, maintaining, and testing Anthem's security systems to ensure that Plaintiff's and Class members' personal, health, and financial

---

[35] Michael Lipkin, *Anthem Data Breach Spawns Email Phishing Scam*, Law360 (Feb. 6, 2015, 9:41 PM), https://www.law360.com/articles/619450 /anthem-data-breach-spawns-email-phishing-scam.

[36] *See* Tara Siegel Bernard, *Protecting Yourself From the Consequences of Anthem's Data Breach*, N.Y. Times (Feb. 5, 2015), http://www.nytimes.com/2015/02/06/business/protecting-yourself-from-the-consequences-of-anthems-data-breach.html?_r=0 (last visited Mar. 18, 2015).

information in Anthem's possession was adequately secured and protected. Anthem further owed a duty to Plaintiff and Class members to implement processes that would detect a breach of its security system in a timely manner and to timely act upon warnings and alerts.

96.    Anthem owed a duty, as articulated in Anthem's notices regarding protected health information, to protect its customers' sensitive financial, health, and personal information.

97.    Anthem owed a duty to safeguard Plaintiff's and the Class' PII and PHI as defined by the regulations that are a part of the HIPAA security requirements scheme, as found in 45 C.F.R. § 164.306, which Plaintiff and the Class had a reasonable expectation that Anthem would fulfill and by failing to monitor its systems to identify suspicious activity, allowing unauthorized access to the personal data of Plaintiff and the Class, and failing to encrypt or otherwise prevent unauthorized reading of such personal data, Anthem breached this duty.

98.    These safeguards are required to include:

- Access Control. A covered entity must implement technical policies and procedures that allow only authorized persons to access electronic protected health information (e-PHI).

- Audit Controls. A covered entity must implement hardware, software, and/or procedural mechanisms to record and examine access and other activity in information systems that contain or use e-PHI.

- Integrity Controls. A covered entity must implement policies and procedures to ensure that e-PHI is not improperly altered or destroyed. Electronic measures must be put in place to confirm that e-PHI has not been improperly altered or destroyed.

- Transmission Security.  A covered entity must implement technical security measures that guard against unauthorized access to e-PHI that is being transmitted over an electronic network.[37]

99.    There is a very close connection between Anthem's failure to follow reasonable security standards to protect its current and former health insurance plan members' personal data and the injury to Plaintiff and the Class.  When individuals have their personal information stolen, they are at risk for identity theft, and need to take steps to protect themselves, including, for example, buying credit monitoring services and purchasing or obtaining credit reports to protect themselves from identity theft.

100.    If Anthem had taken reasonable security measures, data thieves would not have been able to take the personal information of tens of millions of current and former Anthem health insurance plan members.  The policy of preventing future harm weighs in favor of finding a special relationship between Anthem and Plaintiff and the Class.  Anthem's health insurance plan members count on Anthem as their health care provider and/or employer to keep their data safe and in fact are required to share sensitive personal data with Anthem as a condition of health plan enrollment.  If companies are not held accountable for failing to take reasonable security measures to protect their customers' personal data, they will not take the steps that are necessary to protect against future security breaches.

---

[37] http://www.hhs.gov/ocr/privacy/hipaa/understanding/srsummary.html (last visited Mar. 18, 2015).

101.    Anthem owed a duty to timely disclose the material fact that Anthem's computer systems and data security practices were inadequate to safeguard customers' personal and financial data from theft.

102.    Anthem breached these duties by the conduct alleged in the Complaint by, including without limitation, failing to protect its customers' personal, financial, and health information; failing to maintain adequate computer systems and data security practices to safeguard customers' personal, health, and financial information; failing to disclose the material fact that Anthem's computer systems and data security practices were inadequate to safeguard customers' personal and financial data from theft; and failing to disclose in a timely and accurate manner to Plaintiff and members of the Class the material fact of the Anthem Security Breach.

103.    As a direct and proximate result of Anthem's failure to exercise reasonable care and use commercially reasonable security measures, the personal data of current and former Anthem health plan members was accessed by unauthorized individuals who could use the information to commit identity fraud, medical fraud, or debit and credit card fraud. Plaintiff and the Class face the imminent, certainly impending and substantially heightened risk of identity theft, fraud and further misuse of their personal data.

104.    As a proximate result of this conduct, Plaintiff and the other Class members suffered and will continue to suffer damages in an amount to be proven at trial.

## COUNT II — BAILMENT

105.    Plaintiff incorporates by reference those paragraphs set out above as if fully set forth here.

106.    Plaintiff and the Class delivered their personal, health, and financial information to Anthem for the exclusive purpose of obtaining health insurance from Anthem.

107.    In delivering their personal data to Anthem, Plaintiff and Class members intended and understood that Anthem would adequately safeguard their personal data.

108.    Anthem accepted possession of Plaintiff's and Class members' personal data for the purpose of providing health insurance to Plaintiff and Class members.

109.    By accepting possession of Plaintiff's and Class members' personal data, Anthem understood that Plaintiff and Class members expected Anthem to adequately safeguard their personal data.  Accordingly, a bailment (or deposit) was established for the mutual benefit of the parties.

110.    During the bailment (or deposit), Anthem owed a duty to Plaintiff and Class members to exercise reasonable care, diligence and prudence in protecting their personal data as well as a duty to safeguard personal information properly and maintain reasonable security procedures and practices to protect such information.  Defendants breached this duty.

111.    Anthem breached its duty of care by failing to take appropriate measures to safeguard and protect Plaintiff's and Class members' personal, health, and financial information, resulting in the unlawful and unauthorized access to and misuse of Plaintiff and Class members' personal, health, and financial information.  This prior breach should have alerted Anthem of the need for additional security measures.

## COUNT III — BREACH OF IMPLIED CONTRACT

112.    Plaintiff incorporates by reference those paragraphs set out above as if fully set forth here.

113.    Plaintiff and the Class delivered their personal, health, and financial information to Anthem as part of the process of obtaining health insurance from either Anthem or an entity that shared information with Anthem.

114.    Plaintiff and members of the Class entered into implied contracts with Anthem pursuant to which Anthem agreed to safeguard and protect such information and to timely and accurately notify Plaintiff and Class members that their data had been breached and compromised.

115.    In providing such data, Plaintiff and the other members of the Class entered into an implied contract with Anthem whereby Anthem became obligated to reasonably safeguard Plaintiff's and the other Class members' sensitive, non-public information.

116.    In delivering their personal data to Anthem, Plaintiff and Class members intended and understood that Anthem would adequately safeguard their personal data.

117.    Plaintiff and the Class members would not have entrusted their private and confidential financial, health, and personal information to Defendants in the absence of such an implied contract.

118.    Anthem accepted possession of Plaintiff's and Class members' personal data for the purpose of providing health insurance to Plaintiff and Class members.

119.    Plaintiff and members of the Class believed that Anthem would maintain their personal data in a reasonably secure manner and they provided their personal data to

Anthem on that basis for the purpose of purchasing health insurance from Anthem or an entity that shared information with Anthem.

120.   Had Anthem disclosed to Plaintiff and members of the Class that Anthem did not have adequate computer systems and security practices to secure customers' and former customers' personal data, Plaintiff and members of the Class would not have purchased health insurance from Anthem or an entity that shared information with Anthem.

121.   Anthem recognized that its customers' and former customers' personal data is highly sensitive and must be protected, and that this protection was of material importance as part of the bargain to Plaintiff and members of the Class.

122.   Plaintiff and members of the Class fully performed their obligations under the implied contracts with Anthem.

123.   Anthem breached the implied contract with Plaintiff and the other members of the Class by failing to take reasonable measures to safeguard their data.

124.   As a proximate result of this conduct, Plaintiff and the other Class members suffered and will continue to suffer damages in an amount to be proven at trial.

## COUNT IV — UNJUST ENRICHMENT

125.   Plaintiff incorporate by reference those paragraphs set out above as if fully set forth herein.

126.   Plaintiff and Class members conferred a monetary benefit on Anthem in the form of monies paid for the purchase of health insurance from Anthem or an entity that shared information with Anthem.

127.   The monies paid by the Plaintiff and Class members were supposed to be used by Anthem, in part, to pay for the administrative and other costs of providing reasonable data security and protection to Plaintiff and Class members.

128.   Anthem failed to provide reasonable security, safeguards, and protections to the personal data of Plaintiff and Class members, and as a result the Plaintiff and Class overpaid Anthem as part of the health insurance they purchased.

129.   Anthem failed to disclose to Plaintiff and members of the Class that its computer systems and security practices were inadequate to safeguard health insurance plan customers' and former customers' personal data against theft.

130.   Under principles of equity and good conscience, Anthem should not be permitted to retain the money belonging to Plaintiff and Class members because Anthem failed to provide adequate safeguards and security measures to protect Plaintiff's and Class members' personal, health, and financial information that they paid for but did not receive.

131.   Anthem wrongfully accepted and retained these benefits to the detriment of Plaintiff and Class Members.

132.   Anthem's enrichment at the expense of Plaintiff and Class Members is and was unjust.

133.    As a result of Anthem's wrongful conduct, as alleged above, Plaintiff and the Class are entitled under the unjust enrichment laws of all 50 states to restitution and disgorgement of all profits, benefits, and other compensation obtained by Anthem, plus attorneys' fees, costs, and interest thereon.

## RELIEF REQUESTED

Plaintiff, individually and on behalf of the proposed Classes, request that the Court:

1.    Certify this case as a class action on behalf of the Class defined above, appoint Steven L. Hayes as class representative, and appoint the undersigned counsel as class counsel;

2.    Award declaratory, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and other Class members;

3.    Award restitution and damages to Plaintiff and Class members in an amount to be determined at trial;

4.    Award Plaintiff and Class members their reasonable litigation expenses and attorneys' fees to the extent allowed by law;

5.    Award Plaintiff and Class members pre- and post-judgment interest, to the extent allowable; and

6.    Award such other and further relief as equity and justice may require.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury of any and all issues in this action so triable of right.

Dated:  April 1, 2015                        By:    /s/ Edmond Foley
                                             Edmond W. Foley
                                             **FOLEY & SMALL**
                                             1002 E. Jefferson Boulevard
                                             South Bend, IN 46617
                                             Telephone: (574) 288-7676
                                             efoley@foleyandsmall.com

Bryan L. Bleichner
Francis J. Rondoni
Jeffrey D. Bores
**CHESTNUT CAMBRONNE PA**
17 Washington Avenue North, Suite 300
Minneapolis, MN 55401
Telephone: (612) 339-7300
Fax: (612) 336-2940
bbleichner@chestnutcambronne.com
frondoni@chestnutcambronne.com
jbores@chestnutcambronne.com

Gary F. Lynch
Edwin J. Kilpela, Jr.
Jamisen A. Etzel
**CARLSON LYNCH SWEET & KILPELA,
LLP**
PNC Park
115 Federal Street, Suite 210
Pittsburgh, PA 15212
Telephone:  (412) 322-9243
Fax:  (412) 231-0246
glynch@carlsonlynch.com
ekilpela@carlsonlynch.com
jetzel@carlsonlynch.com

Karen Hanson Riebel
Heidi M. Silton
Kate M. Baxter-Kauf
**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
100 Washington Avenue South
Suite 2200
Minneapolis, MN 55401-2159
Telephone:  (612) 339-6900
Fax:  (612) 339-0981
khriebel@locklaw.com
hmsilton@locklaw.com
kmbaxter-kauf@locklaw.com

W. Daniel "Dee" Miles, III
Larry A. Golston
Andrew E. Brashier

40

**BEASLEY, ALLEN, CROW, METHVIN, PORTIS & MILES, P.C.**
272 Commerce Street
Post Office Box 4160
Montgomery, Alabama 36103-4160
Telephone: (334) 269-2343
Fax: (334) 954-7555
dee.miles@beasleyallen.com
larry.golston@beasleyallen.com
andrew.brashier@beasleyallen.com

Joseph P. Guglielmo
David R. Scott
Erin Green Comite
**SCOTT + SCOTT, ATTORNEYS AT LAW**
156 South Main Street
P.O. Box 192
Colchester, CT 06415
Telephone: (860) 537-5537
Fax: (860) 537-4432
jguglielmo@scott-scott.com
david.scott@scott-scott.com
ecomite@scott-scott.com